

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
10/15/2015

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 15-31526-H4-7 |
| RICHARD DEAN WILCOX, | § | |
| | § | |
| Debtor. | § | |
| | § | |

## MEMORANDUM OPINION ON UNITED STATES TRUSTEE'S MOTION TO CONVERT TO CHAPTER 11 PURSUANT TO 11 U.S.C. § 706(b) OR, IN THE ALTERNATIVE, TO DISMISS THIS CHAPTER 7 CASE PURSUANT TO 11 U.S.C. § 707(a) FOR CAUSE
[Refers to Docket Number 20]

### I. INTRODUCTION

The dispute at bar arises from a motion of the U.S. Trustee (the "UST") to convert a debtor's case from Chapter 7 to Chapter 11 pursuant to 11 U.S.C. § 706(b) or, in the alternative, to dismiss pursuant to 11 U.S.C. § 707(a) (the "Motion"). [Doc. No. 20].[1]  This Court held an evidentiary hearing on the merits of the Motion, and for the reasons set forth herein, the Court has decided to dismiss this case under § 707(a).  Therefore, the Court will not analyze the UST's request to convert this case under § 706(b).[2]

The Court has decided to issue a Memorandum Opinion on its decision to dismiss this case because there is a split among courts about what constitutes "cause" under § 707(a).  After reviewing numerous opinions addressing § 707(a), this Court concludes that a case can be dismissed for "cause" even though the debtor has timely and accurately filed all of his Schedules and Statement of Financial Affairs ("SOFA"), completely cooperated with the trustee (including

---

[1]  Hereinafter, any reference to a section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code.  Further, any reference to "the Code" refers to the United States Bankruptcy Code.

[2]  The dismissal of this case will be without prejudice; therefore, if the Debtor wants to subsequently file a Chapter 11 petition after the order dismissing this case is entered on the docket, the Debtor will be free to do so.

providing all requested documents), and fulfilled all of the other fundamental duties required of an individual in Chapter 7. Indeed, the debtor in the case at bar has timely satisfied all of these requirements, but his premeditated, excessive, pre-petition spending and lavish lifestyle have convinced this Court that "cause" exists to dismiss his case.

The Court makes the following Finding of Facts and Conclusions of Law pursuant to Federal Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such; and to the extent that any Finding of Fact is construed as a Conclusion of Law, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

## II. FINDINGS OF FACT

The relevant facts—as established by the pleadings, the exhibits, and the testimony of the witnesses—are as follows:

### A. Procedural History

1. On March 18, 2015 (the "Petition Date"), Richard Dean Wilcox (the "Debtor") filed a voluntary petition under Chapter 7. [Doc. No. 1]. At the same time that he filed his petition, the Debtor filed his initial Schedules and SOFA and paid his filing fees. [Doc. No. 1, pp. 42–50]; [Doc. Report, Mar. 18, 2015, Evidencing receipt of voluntary petition filing fee]. The Debtor filed his bankruptcy individually, without joinder of his wife. [Doc. No. 1, p.1].

2. In his petition, the Debtor represents that his debts are primarily business debts by checking the appropriate box. [Doc. No. 1, p. 1].

3. The Chapter 7 Trustee testified that the Debtor disclosed all of his assets in his

Schedules and SOFA; that he responded to all of the questions that she asked of him; and that he complied with all of her requests for documents before, during, and after the meeting of creditors. [Hr'g R. 4:13:48–4:17:58, Sept. 8, 2015].

4. On July 29, 2015, the UST filed the Motion. [Doc. No. 20].

5. On August 19, 2015, the Debtor filed a response in opposition to the Motion (the "Response"). [Doc. No. 21].

6. The Court held a multi-day hearing on the Motion on September 8, 2015, September 16, 2015, and September 21, 2015, on which date the UST concluded her case-in-chief. During the hearing, the UST presented her case-in-chief by calling four witnesses— Allison Byman, Cynthia Wright, the Debtor, and Barbara Griffin—and by introducing thirty-two exhibits. The Debtor presented his case-in-chief by calling one witness—the Debtor—and by introducing four exhibits. The UST did not call any rebuttal witnesses.

7. On September 21, 2015, counsel for the UST and the Debtor made closing arguments, and the Court took the matter under advisement.

**B. Factual Background of the Debtor**

8. The Debtor is a civil engineer and land surveyor by training. [Hr'g R. 5:35:44–5:36:18, Sept. 8, 2015]. He is currently employed as the Vice President for Strategic Development for Atwell LLC ("Atwell") and has been so employed since April 2013. [UST Ex. 5b]; [Hr'g R. 5:58:22–6:00:19, Sept. 8, 2015]. In February 2013, the Debtor began working for Atwell on a contractual basis before becoming a full-time employee in April 2013. [Hr'g R. 5:57:53–5:58:22, Sept. 8, 2015]. In May 2013, the Debtor and his family moved from Scottsdale, AZ to Spring, TX. [Hr'g R. 5:35:31–5:35:37;

6:13:05–6:13:36, Sept. 8, 2015].[3]  In 2013, Atwell paid the Debtor over $322,000. [UST Ex. 6b]; [Hr'g R. 6:01:26–6:03:10, Sept. 8, 2015].

9.  The Debtor's current base salary is $250,000. [Hr'g R. 6:02:58–6:03:23, Sept. 8, 2015]. In addition to his base salary, the Debtor receives a housing allowance of $2,300 per month,[4] drives a company car,[5] has an expense account, is eligible for 401(k) contributions, and is eligible to receive an annual management bonus.  [Hr'g R. 6:03:23–6:06:58, Sept. 8, 2015].  For 2014, the Debtor's management bonus was $20,000. [Hr'g R. 6:06:05–6:06:21, Sept. 8, 2015].

10. The Debtor lives at 10 Watertree Court, Spring, Montgomery County, Texas 77380, [UST Ex. 2], and has lived there since May 2013, [Hr'g R. 5:35:18–5:35:31, Sept. 8, 2015].

11. The Debtor's non-filing spouse is not employed outside the home. [Hr'g R. 5:36:21–5:36:33 Sept. 8, 2015]. The Debtor has a household of three, which includes his 20 year old stepson.[6]  [Hr'g R. 5:36:33–5:37:21, Sept. 8, 2015].  The Debtor's stepson lives with the Debtor and his wife, attends Lone Star Community College, and is not otherwise employed. [Hr'g R. 5:36:33–5:37:21, Sept. 8, 2015].

## C. The Debtor's Income and Expenses

12. Atwell pays the Debtor $23,193.33 a month.  [Doc. No. 1, p. 32].  The Debtor pays

---

[3] Atwell paid for the Debtor and his family's move to Houston.  Atwell fronted six months of lease payments to the Debtor in 2013, half of which the Debtor paid back to Atwell. [Hr'g R. 6:32:47–6:33:27, Sept. 8, 2015].

[4] The housing allowance is a $2,300 gross amount, on which the Debtor pays taxes. [Hr'g R. 6:05:30–6:06:05, Sept. 8, 2015].

[5] Atwell provides the Debtor with a company car (a Chevrolet Suburban), pays for the repairs and maintenance on that company car, and also provides the Debtor with a credit card to cover the cost of gasoline when using this company car. [Hr'g R. 6:03:23–6:04:18, Sept. 8, 2015].

[6] The Debtor claims his 20 year old stepson as a dependent. [Hr'g R. 5:36:33–5:37:21, Sept. 8, 2015].

4

$4,600 a month in rent, and has scheduled an additional $2,210 for monthly utilities and other expenses for his residence. [UST Ex. 2, pp. 35–36]. Of the $2,210, $560 is for home maintenance, which includes a housekeeper.[7] [UST Ex. 2, pp. 35–36]; [Hr'g R. 9:39:26–9:40:53, Sept. 16, 2015]. The Debtor's Schedule J includes, but is not limited to, monthly expenses for the following: $2,323.51 of voluntary 401(k) plan contributions; $300 for laundry and dry cleaning; $500 for personal care products and services; $400 for transportation; $500 for his son's education costs; and $300 for entertainment, clubs, recreation, newspapers, magazines and books. [UST Ex. 2, pp. 33–36]. The Debtor has also scheduled $2,604 for "other" monthly expenses which include, among other items, $400 for work lunches, $100 for toll road fees, $500 for the barber and beauty salon, $324 on storage for excess furniture, and a $500 allowance for his stepson.[8] [UST Ex. 2, p. 38]; [Hr'g R. 9:37:01–9:38:24, Sept. 16, 2015].

13. According to the Debtor's Schedule J, despite his $23,193.33 monthly gross income, he will only have $2.68 in monthly net income. [UST Ex. 2, p. 37].

14. However, using the standards set forth by the IRS on the UST website,[9] a UST review of the Debtor's Schedules, SOFA, pay advices, income and expenses, [Hr'g R. 10:46:35–10:47:28, Sept. 16, 2015], demonstrates that the Debtor could have up to $9,016.19 in monthly net income to fund a plan—which would result in an approximately three percent distribution on general unsecured debts in 60 months, [UST

---

[7] UST Ex. 17 demonstrates that the Debtor includes "Housekeeping" (i.e., a housekeeper) into the cost of "Home Maintenance." The $560 figure for "Home Maintenance" is based on the average monthly amount that the Debtor spent on "Home Maintenance" in 2014. [UST Ex. 17; Hr'g R. 9:27:44–9:29:13; 9:39:26–9:40:53, Sept. 16, 2015].

[8] This expense is in addition to the scheduled $500 a month for education costs. [UST Ex. 2 pp. 36–38]; [Hr'g R. 9:40:53–9:42:54, Sept. 16, 2015].

[9] See Means Testing, U.S. Trustee Program, United States Department of Justice, http://www.justice.gov/ust/means-testing (last visited Oct. 15, 2015).

Ex. 22b].

**D. The Debtor's Debts**

15. The Debtor has scheduled $4,603.32 in secured claims, [UST Ex. 2, p. 6], and $16,920,102.09 in unsecured claims, [UST Ex. 2, pp. 24, 26–29].[10]   The Schedule F debt is primarily business debt, which resulted from the failure of the Debtor's prior business and his execution of personal guaranties on his now defunct company's debts. However, $70,966 of the unsecured debt listed on the Debtor's Schedule F is personal credit card debt. [UST Ex. 2, pp. 27–29].

**E. Pre-Bankruptcy Counseling Provided to the Debtor**

16. Since the first quarter of 2013, the Debtor has been receiving advice from bankruptcy counsel. [Hr'g R. 6:26:40–6:27:24; 6:28:38–6:29:28, Sept. 8, 2015].   When the Debtor first began receiving advice from bankruptcy counsel, he was working for Atwell on a contractual basis, and was planning his move to the Houston area. [Hr'g R. 6:26:40–6:27:24, Sept. 8, 2015].   When the Debtor moved to Texas in 2013, he was referred to Melissa R. Lanier ("Lanier"), a local bankruptcy attorney by his then bankruptcy attorney in Arizona, Brad Stanley. [Hr'g R. 6:28:38–6:29:28; 6:26:40–6:27:24, Sept. 8, 2015].   Although the Debtor spoke with Lanier in prior months, he did not make his first payment to her until October 31, 2013, the same day that the Debtor received an IRS refund check for approximately $204,576. [Hr'g R. 6:26:04–6:26:40, Sept. 8, 2015].   During the September 16, 2015 hearing, the Debtor testified that he stopped paying his monthly American Express credit card bills based on advice received from his bankruptcy counsel. [Hr'g R. 10:12:00–10:13:12, Sept. 16, 2015].   In late 2013,

---

[10] In both the Motion and the Response, the UST as well as the Debtor both state that the total unsecured claims are approximately $16,920,102. Hence, there is absolutely no dispute about the massive amount of debt with which the Debtor is saddled.

when the Debtor had already stopped making these payments, American Express sued him. [Hr'g R. 6:27:47–6:28:06, Sept. 8, 2015]; [UST Ex. 2, p. 43, Disclosure of lawsuit filed by American Express that was pending on the Petition Date]. This suit was stayed when the Debtor filed for bankruptcy. [Hr'g R. 6:27:40–6:28:06, Sept. 8, 2015]. The Debtor admits that he did not make any payments on his American Express bill or attempt to settle with American Express because he did not want to create a *preference in bankruptcy* to any creditors. [Hr'g R. 6:31:00–6:31:48, Sept. 8, 2015]; [Hr'g R. 10:12:12–10:13:39, Sept. 16, 2015] (emphasis added).[11]

### F.  Joint and Separate Bank Accounts

17. Prior to March 2015, the Debtor and his wife maintained separate bank accounts. [UST Ex. 8b, p. 222]; [UST Ex. 8c]; [Hr'g R. 5:45:47–5:48:05, Sept. 8, 2015]. Both the Debtor's bi-weekly paychecks from Atwell, as well as his 2014 bonus, were deposited into his wife's bank account in order to avoid wage garnishment. [UST Ex. 8b, p. 222]; [UST Ex. 8c]; [Hr'g R. 5:47:11–5:48:05, Sept. 8, 2015]. In the month that the Debtor filed for bankruptcy, he added his name to his wife's bank account because he no longer needed protection from wage garnishment. [Hr'g R. 5:47:11–5:48:05, Sept. 8, 2015].[12]

### G.  The IRS Refund and the Credit Card Debt Owed to American Express

18. On October 31, 2013, the Debtor received a refund from the IRS for approximately

---

[11] At the hearing on the Motion on September 16, 2015, the Debtor explained why he stopped paying his monthly American Express credit card bills. The Debtor said that he did not make payments because his bankruptcy attorney advised him not to in order to avoid creating a preference in bankruptcy. ("It was my understanding that [it] would create some problems with potential bankruptcy filing down the road . . . he called it a preference . . . [this was] 20 [or] 21 months [before the Petition Date]"). [Hr'g R. 10:12:39–10:13:51, Sept. 16, 2015].

[12] At the hearing on the Motion on September 8, 2015, the Debtor testified that he and his wife maintained separate bank accounts until March 2015. He also testified that his salary from Atwell was deposited into his wife's bank account to "avoid any garnishment." The Debtor testified that he added his name to his wife's bank account in March 2015 because it was "no longer necessary" to maintain separate bank accounts in order to avoid wage garnishment, "because [he] filed for bankruptcy protection."). [Hr'g R. 5:45:16–5:48:05, Sept. 8, 2015].

$204,576 (the "Refund") due to the mistreatment of depreciation of the Debtor's airplanes in 2009, owned for the benefit of the Debtor's now defunct company.[13] [UST Ex. 7a, p. 116]; [Hr'g R. 9:59:33–10:01:01, Sept. 16, 2015].

19. The Debtor actually settled with the IRS in February 2013, [Hr'g R. 10:01:01–10:01:25, Sept. 16, 2015], and anticipated receiving the Refund by May 2013, [Hr'g R. 10:01:27–10:01:59, Sept. 16, 2015]. However, the Debtor did not actually receive the Refund until October 31, 2013. [Hr'g R. 10:01:27–10:01:59, Sept. 16, 2015].

20. The "new charges" on the Debtor's May 2013 American Express bill totaled over $47,000. [UST Ex. 11b, p. 457]. During this month, charges included $8,733 for a new bedroom furniture set, [Hr'g R. 6:21:21–6:22:48, Sept. 8, 2015]; [UST Ex. 11b, p. 462]; $4,294 for airline flights; [UST Ex. 11b, pp. 457–468] and over $19,600 for purchases at Nordstrom, an upscale fashion retailer. [UST Ex. 11b, pp. 457–468].

21. Beginning in June 2013, the Debtor stopped paying off his American Express bills in full; instead, he only made partial payments. [UST Ex. 11b, pp. 446, 457, 474]; [Hr'g R. 10:07:11–10:08:21, Sept. 16, 2015].

22. The Debtor testified at the September 16, 2015 hearing that he had planned to use the Refund to completely pay off the debt owed to American Express. [Hr'g R. 10:07:01–10:09:41, Sept. 16, 2015]. Yet, in August 2013, the Debtor stopped making any payments whatsoever to American Express. [Hr'g R. 10:09:41–10:12:39, Sept. 16, 2015].

23. He stopped making payments to American Express based on a recommendation from his bankruptcy attorney that he not pay back this debt. [Hr'g R. 10:12:00–10:13:12,

---

[13] The $204,576 that the Debtor received was the amount owed to him based off of the 2009 mistreatment and adjusted for his 2014 taxes. [Hr'g R. 9:59:33–10:01:01, Sept. 16, 2015].

Sept. 16, 2015].

24. When the Debtor received the Refund, he continued not making any payments to American Express.  [Hr'g R. 10:14:14–10:14:29, Sept. 16, 2015]; [Hr'g R. 6:23:45– 6:24:48, Sept. 8, 2015].

25. Instead of paying American Express in full, as he originally intended, the Debtor used the Refund to purchase various items including, but not limited to, a $22,591 two-year prepaid lease on a Mercedes-Benz vehicle for his wife, [UST Ex. 18]; [Hr'g R. 6:34:29– 6:35:07, Sept. 8, 2015]; a $16,813 trip for his stepson to Peru and Nepal through the organization "Projects Abroad,"  [UST Ex. 18]; [Hr'g R. 6:35:07–6:36:24, Sept. 8, 2015]; airfare and lodging in London, San Francisco, Phoenix, and Michigan totaling $18,504, [UST Ex. 18]; and $23,586 for goods and services at Nordstrom, Bluefly, Zappos, and Bloomingdales, [UST Ex. 18].

## H.  401(k) Contributions

26. The Debtor began making regular and voluntary 401(k) contributions in June 2013.[14] [UST Ex. 5b, p. 5].  In December of that year, the Debtor made an additional $14,038 contribution, as well as a $570.21 catch-up contribution.  [UST Ex. 5b, p. 17–18].

27. In 2014, the Debtor made $17,000 in voluntary employee contributions and $5,500 in catch-up contributions, to his 401(k).  [UST Ex. 5b, p. 44–45]

28. Between January 1, 2015 and the Petition Date, the Debtor had contributed $5,813.34 in voluntary and catch-up contributions to his 401(k). [UST Ex. 5b, p. 51].

## I.  Immediate Pre-Bankruptcy Spending

29. On the Petition Date, the Debtor scheduled $368.00 in "Cash on hand," and $325.03 in

---

[14] In June 2013 the Debtor began deducting $288.46 per pay period. [UST Ex. 5b, p. 5].  This is, notably, the same month that he stopped making payments on his American Express bill on the advice of his bankruptcy counsel. [Hr'g R. 10:07:11–10:08:21; 10:12:00–10:13:12, Sept. 16, 2015]; [UST Ex. 11b, pp. 446, 457, 474].

"Checking, savings or other financial accounts, certificates of deposit or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives." [UST Ex. 2, p. 7].

30. In the three months prior to the Petition Date, the Debtor and his wife spent over $2,300 at Nordstrom; over $2,100 at Zappos, an online shoes and clothing shop; and over $2,500 at other retail locations. [UST Ex. 8a, pp. 211–17]; [UST Ex. 8b, pp. 300–02; 306–08]; [UST Ex. 8c, pp. 312–14]. The Debtor and his wife also spent $2,514 at the Apple Store. [UST Ex. 8b, p. 302]. Further, they spent over $2,000 at a day spa, over $500 at a nail salon, and $3,800 at a fitness club. [UST Ex. 8b; pp. 300–02, 306–08]. During this same time period, the Debtor and his wife's bank accounts reflect that they spent over $7,300 at restaurants and grocery stores. [UST Ex. 8a, pp. 211–217]; [UST Ex. 8b, pp. 300–310]; [UST Ex. 8c, pp. 312–316]. Additionally, between January 2015 and March 2015, the Debtor spent $1,960—or $130 per week—for a housekeeper. [UST Ex. 17]; [Hr'g R. 9:26:59–9:29:13, Sept. 16, 2015].

31. In the three months prior to the Petition Date, the Debtor traveled, among other places, to Scottsdale, Arizona, [UST Ex. 8a, pp. 214, 219], and Hawaii, [UST Ex. 8a, pp. 214–15], where he spent over $3,800 on lodging, [Hr'g R. 9:25:30–9:26:53, Sept. 16, 2015], and enjoyed several fine dining experiences,[15] [UST Ex. 8a, pp. 214–25]; [UST Ex. 8b, p. 308].

### III. CREDIBILITY OF WITNESSES

Four witnesses testified during the multi-day hearing on the Motion: Allison Byman, the Chapter 7 Trustee in the Debtor's case; Cynthia Wright, a paralegal with the office of the UST;

---

[15] These fine dining experiences included restaurant charges for $254.59 and $213.08, as well as a $162.46 charge at the Lava Lava Beach Club. [UST Ex. 8a, p. 215].

Richard D. Wilcox, the Debtor in this Chapter 7 case; and Barbara Griffin, a bankruptcy analyst with the UST. Each of the witnesses answered the questions that they were asked forthrightly; therefore, this Court finds that all witnesses were credible and accords their testimony equal weight.

### IV. CONCLUSIONS OF LAW

#### A. Jurisdiction

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334(b). 28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

The phrase "arising under title 11" refers to "those proceedings that involve a cause of action created or determined by a statutory provision of title 11." *Matter of Wood*, 825 F.2d 90, 96 (5th Cir. 1987). Here, the UST seeks conversion from Chapter 7 to Chapter 11 under § 706(b), which provides that a bankruptcy court "may convert a case under this chapter to a case under chapter 11 of this title at any time;" or, in the alternative, the UST seeks dismissal under § 707(a), which provides that a bankruptcy court may "dismiss a case under this chapter only after notice and a hearing and only for cause." Thus, the relief requested in the Motion is created by express Code provisions: § 706(b) and § 707(a). Consequently, the subject matter is within federal district court jurisdiction pursuant to 28 U.S.C. § 1334(b), and has been appropriately referred to this Bankruptcy Court under General Order 2012-6.

**B. Venue**

Venue is proper under 28 U.S.C. § 1408(1) because the Debtor resided in the Southern District of Texas for the 180 days immediately preceding the Petition Date.

**C. Constitutional Authority to Enter a Final Order**

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any dispute brought before it. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620. The pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O) because whether or not to dismiss this case concerns the administration of this estate and also affects the adjustment of the relationship between the Debtor and his creditors. Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here. A core proceeding under § 157(b)(2)(A) and (O) is entirely different than a core proceeding under § 157(b)(2)(C). *See, e.g., Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (8th Cir. B.A.P. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also In re Davis*, 538 F. App'x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, 134 S. Ct. 1002 (2014) ("[W]hile it is

true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' . . . We decline to extend *Stern*'s limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar. In *Stern*, the debtor filed a counterclaim based *solely* on state law; whereas, here, the Motion brought by the UST is based solely on express Code provisions (§§ 706(b) and 707(a)) and judicially-created bankruptcy law interpreting these provisions; there is no state law involved whatsoever. This Court is therefore constitutionally authorized to enter a final order on the Motion. *See In re Airhart*, 473 B.R. 178, 181 (Bankr. S.D. Tex. 2012) (noting that the court has constitutional authority to enter a final order when the dispute is based upon an express provision of the Code and no state law is involved).

Finally, in the alternative, this Court has the constitutional authority to enter a final order on the Motion because all the parties in this contested matter have consented, impliedly if not explicitly, to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent. . . ."). Indeed, the UST filed

the Motion in this Court, [Finding of Fact No. 4]; the Debtor filed the Response opposing the

Motion, [Finding of Fact No. 5], and the parties proceeded to make a record in a multi-day

hearing without ever objecting to this Court's constitutional authority to enter a final order on the

Motion, [Finding of Fact No. 6].   If these circumstances do not constitute consent, nothing does.

## D. Dismissal for "Cause" under 11 U.S.C. §707(a)

The UST seeks dismissal of the Debtor's case for "cause" under § 707(a).[16]  [Doc. No.

20].  This section provides as follows:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and
> only for cause, including—
> >  (1) unreasonable delay by the debtor that is prejudicial to creditors;
> >  (2) nonpayment of any fees or charges required under chapter 123 of title 28;
> >  and
> >  (3) failure of the debtor in a voluntary case to file, within fifteen days or such
> >  additional time as the court may allow after the filing of the petition
> >  commencing such case, the information required by paragraph (1) of
> >  section 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a).   The Fifth Circuit has issued at least two opinions addressing § 707(a).  Both

involve motions to dismiss Chapter 7 filings of corporations, not individuals, and to this extent,

the cases are distinguishable from the case at bar.   Nevertheless, they do offer guidance to this

Court.

In *Matter of Atlas Supply Corp.*, 857 F.2d 1061 (5th Cir. 1988), the bankruptcy court

denied the motion to dismiss; the district court affirmed this ruling; and the Fifth Circuit affirmed

---

[16] The UST does <u>not</u> seek dismissal under § 707(b), as the Debtor is a non-consumer business debtor as defined by §
101(8).   That section states that a debtor's debts are "primarily consumer debts" if they exceed fifty percent of the
debtors total debt.   *In re Booth*, 858 F.2d 1051, 1055 (5th Cir. 1988) ("It has been noted, we believe correctly, that
'primarily' suggests an overall ratio of consumer to non-consumer debts of over fifty percent."); *Stewart v. United
States Trustee (In re Stewart)*, 175 F.3d 796, 808 (10th Cir. 1999).  Section 707(b) applies only to consumer debtors,
which is why the UST seeks dismissal here under only § 707(a).  [Hr'g R. 4:33:45–4:34:23, Sept. 21, 2015, Closing
arguments by counsel for UST) ("This is not a consumer case, as pointed out . . . § 707(b) does not apply...it has
never been argued and we have never argued it was a consumer debt case.").  Here, although the Debtor has
substantial consumer debts (i.e., $70,966 in credit card debt), he has approximately $16.9 million of business debt,
[Finding of Fact No. 15]—which means that the Debtor is a "non-consumer business debtor" as opposed to a
"consumer debtor."

the district court's decision.  *Id.* at 1063.  In issuing its ruling, the Fifth Circuit stated the

following:

> Under past bankruptcy law, whether to grant a motion to dismiss has been guided by
> equitable principles: "The court must balance the equities and weigh the 'benefits and
> prejudices' of a dismissal."  Section 707 itself does not preclude the application of
> equitable principles.   Since equitable principles may be applied under the present
> Bankruptcy Code, the decision whether to grant a motion to dismiss a petition in
> bankruptcy lies within the discretion of the bankruptcy judge."

*Id.* at 1063 (citations omitted).

In a very recent opinion, the Fifth Circuit affirmed the district court's reversal of the

bankruptcy court's denial of a motion to dismiss.  *In re Cypress Financial Trading Co., L.P.,*

2015 U.S. App. LEXIS 14347 (5th Cir. 2015).  In affirming the district court's decision, the Fifth

Circuit stated the following:

> In this appeal [the debtor] contends that bad faith is not "cause" to dismiss a Chapter 7
> bankruptcy case under § 707(a) and invites us to choose sides in a circuit court split on
> that issue.  Although the relevant law strongly suggests that "cause" includes bad faith,
> we need not so hold to resolve this case. When a bankruptcy serves no purpose, results in
> no benefit for its creditors or the debtor, and only delays litigation already pending
> against the debtor, there is "cause" to dismiss the case.
>
>         Under 11 U.S.C. § 707(a), the bankruptcy court "may dismiss a case under
> [Chapter 7]. . . for cause." Section 707 does not define "cause," but instead provides a list
> of examples, like the debtor's unreasonable delay of the proceedings, failure to pay
> required fees, or untimely filing of schedules and financial statements. *The examples,
> however, are illustrative, not exhaustive.  "Cause" is a broad concept, designed to
> "afford flexibility to the bankruptcy courts." This flexibility derives from bankruptcy's
> equitable roots. True to equity's flexibility, we have instructed courts to "weigh the
> benefits and prejudices" of dismissal—to the debtor, creditors, and the bankruptcy
> system—when deciding a § 707(a) motion.*

*Id.* at *2 (emphasis added).

Although *Atlas Supply* and *Cypress Financial* involved dismissal under § 707(a) of

corporate cases, this Court sees no reason why the above referenced language should not apply to

requests for dismissal under § 707(a) in non-consumer cases filed by individuals. *Id.* at *1; *Atlas*

15

*Supply*, 857 F.2d at 1062.  Thus, in the case at bar, this Court will keep in mind that it has broad discretion in ruling on the Motion, and will keep one eye constantly cocked on balancing the benefits of dismissal versus the prejudice of dismissal.

This Court also notes the Fifth Circuit's observation in *Cypress Financial* that there is a split among the circuit courts about how to analyze § 707(a), with some courts holding that "cause" under this provision includes bad faith conduct and others holding that it does not. *Cypress Financial*, 2015 U.S. App. LEXIS 14347 at *1.  In exercising its broad discretion in ruling on the Motion, this Court finds it instructive to review how other circuit courts, and lower courts, have interpreted the meaning and breadth of the word "cause" in § 707(a) when determining whether to dismiss a case filed by an individual.

### 1.  Some courts analyze § 707(a) by focusing on whether the debtor has acted in bad faith

The Third, Sixth, and Eleventh Circuits, in addition to a number of lower courts, have focused on whether there is a lack of good faith on the debtor's part when deciding whether "cause" exists to warrant dismissal under § 707(a).[17]  *See In re Zick*, 931 F.2d 1124 (6th Cir. 1991); *see also In re Tamecki*, 229 F.3d 205, 207 (3rd Cir. 2000) ("Section 707(a) allows a bankruptcy court to dismiss a petition for abuse if the petition fails to demonstrate his good faith in filing"); *In re Piazza*, 719 F.3d 1253, 1260–61 (11th Cir. 2013) ("We conclude that, based on the ordinary meaning of the statutory language and the principles of statutory construction, the power to dismiss 'for cause' in § 707(a) includes the power to involuntarily dismiss a Chapter 7 case based on prepetition bad faith.").  In *Zick*, the Sixth Circuit held that "good faith is an explicit jurisdictional requirement" and that a lack of good faith is a "valid cause for dismissal

---

[17] As far as this Court is concerned, "lack of good faith" has the same meaning as "bad faith." *See Zick*, 931 F.2d at 1127 (using "bad faith" and "lack of good faith" interchangeably); *Tamecki*, 229 F.3d at 206–07 (same); *In re Geddes*, 2012 Bankr. LEXIS 5843; 2012 WL 6091407, n.8 (Bankr. N.D. Ala. 2012) ("The terms 'bad faith' and 'lack of good faith' will be used interchangeably throughout this opinion.").

under § 707(a)." *Zick*, 931 F.2d at 1126–27.

The Eighth Circuit has expressed the concern that an "open-ended use of bad faith to dismiss Chapter 7 cases" is inappropriate, and adopted a "narrow, cautious approach to bad faith under § 707(a)." *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994) (adopting the standard articulated in *In re Khan*, 172 Bankr. 613, 1994 WL 515358 (Bankr. D. Minn. 1994)).   The Eighth Circuit has reasoned that, while some conduct constituting cause to dismiss a Chapter 7 petition could be characterized as bad faith, "framing the issue in terms of bad faith may…misdirect the inquiry away from the fundamental purposes of Chapter 7." *Id.*  The Eighth Circuit has limited a finding of bad faith as cause to dismiss under § 707(a) to "extreme misconduct falling outside of the purview of more specific Code provisions," and held that if a bankruptcy court chooses to take action against a bad faith debtor using its inherent judicial power, it preferably should be done through some provision other than § 707(a). *Id.*

## 2.  Other courts have held that "bad faith" does not constitute "cause" under § 707(a)

Unlike other circuits, the Ninth Circuit takes a much more forgiving attitude towards debtors when analyzing a request for dismissal under § 707(a).  In *Padilla*, the debtor racked up almost $100,000 in credit card debt the year preceding his Chapter 7 filing; and over fifty percent of this debt related to gambling losses.[18] *In re Padilla*, 222 F.3d, 1184, 1187 (9th Cir. 2000). The bankruptcy court found that cause existed under § 707(a) because the debtor had acted in bad faith accumulating debts that he knew he had no ability to repay.  *Id.*  The bankruptcy appellate panel reversed this ruling, and the UST appealed.  *Id.*  The Ninth Circuit noted that "[w]hether bad faith can provide 'cause' for dismissing a Chapter 7 bankruptcy petition pursuant to § 707(a) is a matter of first impression for this court." *Id.* at 1191.  After reviewing holdings of other circuits and comparing the purposes behind Chapters 11 and 13 to the purpose of

---

[18] The bankruptcy court characterized the debtors conduct as a "credit card bust-out." *Padilla*, 222 F.3d at 1188.

Chapter 7, the Ninth Circuit held that: "The Bankruptcy Code's language and the protracted relationship between reorganization debtors and their creditors lead us to conclude that bad faith per se can properly constitute 'cause' for dismissal of a Chapter 11 or Chapter 13 *but not of a Chapter 7 petition under § 707(a)*." *Id.* at 1193 (emphasis added). The Ninth Circuit came to this conclusion, in part, by noting that Congress enacted § 707(b)—as opposed to § 707(a)—to provide an avenue for dismissal for unscrupulous debtors, at least those who are debtors with consumer debt. *Id.* at 1194.

Applying its holding to the specific debtor who was the subject of the appeal, the Ninth Circuit—which acknowledged that the debtor had in fact committed a so called "credit card bust-out"—nevertheless held that this conduct "did not constitute cause under § 707(a) and thus the bankruptcy court's dismissal of [the debtor's] petition pursuant to § 707(a) was improper." *Id.* The Ninth Circuit, while certainly aware of the "bust-out," focused on whether the debtor had fulfilled his fundamental obligations as a debtor once he filed his petition. *Id.* at 1193. Indeed, the Ninth Circuit emphasized that "there is no evidence that [the debtor] violated any technical or procedural requirements of Chapter 7. *Id.* The record reveals no further violation to pay filing fees or file necessary information. *Id.* [The debtor] did not falsify bankruptcy forms or cause delays during the administration of a [sic] bankruptcy proceeding." *Id.* Under these facts, the Ninth Circuit held that there was no "cause" to dismiss the debtor's case under § 707(a). *Id.* at 1194.

### 3. Other courts have held that no "bad faith" analysis is required and that "cause" is established when the debtor has been selfish

The Seventh Circuit has determined that "cause" to dismiss a debtor's Chapter 7 petition does not require a conclusion that a debtor's conduct amounts to bad faith. *In re Schwartz*, 2015 U.S. App. LEXIS 14846, *10 (7th Cir. 2015). This issue was sufficiently important for a direct

appeal from the bankruptcy court to the Seventh Circuit. *Id.* at *1. The Seventh Circuit, affirming the bankruptcy court, found that "cause" for dismissal under § 707(a) was proper where the debtors attempted to defend themselves from a judgment by filing a Chapter 7 bankruptcy while continuing to spend thousands of dollars on "inessential consumer goods and services." *Id.* at *2, *12.

Specifically, the debtors spent over $11,000 a month leading an extravagant lifestyle and paying for items such as private school tuition and a luxury vehicle, "which continued post-petition without any hint of belt tightening," *In re Schwartz*, 532 B.R. 710, 715 (Bankr. N.D. Ill. 2015), *aff'd*, 2015 U.S. App. LEXIS 14846 (7th Cir. 2015), and where the debtors "fail[ed] to use any of their earnings or assets to pay any part of the debt they owed [to their creditors]," 2015 U.S. App. LEXIS 14846 at *7. The bankruptcy court further reasoned that the debtors' "income level is so high, that [they] shouldn't be in a Chapter 7. They should be making some effort," (i.e., pay back some portion of their debts or at least incur fewer luxury expenses). 532 B.R. at 715.

Notably, the bankruptcy court made no finding that the debtors had acted in bad faith, and in fact, refused to consider "bad faith" to denote "cause" for dismissing a bankruptcy case under § 707(a). 2015 U.S. App. LEXIS 14846 at *7, *10 ("These and other cases often use 'bad faith' to denote 'cause' for dismissing a bankruptcy petition for other than procedural reasons, but we can't see what is gained by the terminological substitution."). Rather, the bankruptcy court focused on "for cause" cut loose from the three subsections in § 707(a) and evaluated the case by considering all of the circumstances. *Id.* at *7. The bankruptcy court found cause to dismiss the debtors' case pursuant to § 707(a) because "allowing them to remain in Chapter 7, while maintaining [their extravagant] lifestyle, would result in a misuse of the

protections granted by the Bankruptcy Code." 532 B.R. at 716.

The Seventh Circuit, in affirming the bankruptcy court's decision and in rejecting the debtors' argument that "cause" under § 707(a) encompasses only post-petition failure to comply with fundamental requirements of the Code, held as follows:

> It would make no sense to limit "for cause" to procedural defects in the bankruptcy petition. Suppose the debtor can pay all or some of his debts without hardship yet refuses without any plausible excuse. We agree with the cases that allow "for cause" to embrace conduct that, while not a violation of required procedures, avoids repayment of debt without an adequate reason.

2015 U.S. App. LEXIS 14846 at * 7.  Moreover, the Seventh Circuit held that because the debtors "failed to pay as much of their indebtedness without hardship," their "actions w[ere] deliberate and selfish" and therefore, there was cause for dismissal. *Id.* at *8.

### 4. This Court's approach of how to determine whether "cause" exists under § 707(a) with respect to an individual debtor

Distilling the above referenced opinions leads this Court to conclude that there are essentially two approaches to determining whether "cause" exists under § 707(a) to dismiss a case of an individual debtor.  One is that so long as the debtor has timely, completely, and accurately filed his schedules and SOFA (and other required documents), paid his filing fee, appeared at the meeting of creditors and answered the questions posed to him truthfully, and not impeded the Chapter 7 trustee in carrying out his/her duties, then "cause" under § 707(a) cannot exist.  The second approach is that even if a debtor has satisfied all of the requirements set forth above, "cause" can still exist if the debtor's conduct in some other way, either pre-petition or post-petition, is questionable—not necessarily dishonest but rather reflecting an attitude that is repugnant to the "fresh start" principle of the Code.

The Court has reflected upon these two views, and also focused on the Fifth Circuit's holdings in the corporate Chapter 7 cases of *Atlas Supply* and *Cypress Financial*.  Given that **(1)**

the Fifth Circuit held in *Cypress Financial* that "cause" is a broad concept and that the specific examples of "cause" in the three subsections of § 707(a) "are illustrative, not exhaustive," *Cypress Financial*, 2015 U.S. App. LEXIS 14347 at \*2; and **(2)** the Fifth Circuit emphasized in both *Atlas Supply* and *Cypress Financial* that a motion to dismiss under § 707(a) requires weighing the benefits and prejudices of dismissal, *Atlas Supply* 857 F.2d at 1063; *Cypress Financial* 2015 U.S. App. LEXIS at \*2, this Court concludes that it should adopt the second approach in applying § 707(a) to individual debtors.  This second approach is unquestionably broader in scope than the first approach, and certainly requires this Court to do more than just scrutinize whether the debtor has fulfilled his post-petition obligations on a timely basis.  The Court will now apply this second interpretation to the Motion in the case at bar.

### 5.  In the case at bar, the evidence supports a finding of "cause" for dismissal under § 707(a)

There is no question that the Debtor in the case at bar has timely, completely, and accurately filed all of his Schedules and SOFA, has paid his filing fee, has been very cooperative in providing the Trustee with documents that she has requested, and has testified truthfully about his financial affairs.  [Findings of Fact Nos. 1 & 3].  Nevertheless, under the approach that this Court has chosen to take in ruling on the Motion, the Court must focus on whether the Debtor's overall conduct, both pre-petition and post-petition, has impugned the integrity of the bankruptcy system.  Considering all of the circumstances discussed in detail below, this Court finds that the Debtor's actions constitute conduct undeserving of a discharge in Chapter 7.  Stated differently, the Debtor's actions amount to "cause" under § 707(a).

In *Schwartz,* the bankruptcy court reasoned that the debtors' "income level is so high, that [they] shouldn't be in a Chapter 7.  They should be making some effort."  532 B.R. at 715.  The Debtor in the case at bar is gainfully employed, earns a substantial salary and receives a host of

21

benefits—including a housing allowance, a company car, an expense account, 401(k) contributions, and eligibility for a management bonus. [Findings of Fact Nos. 8 & 9]. In addition to his income, he received the Refund from the IRS of over $200,000, none of which he used to pay back his creditors. [Findings of Fact Nos. 18 & 24]. He has demonstrated no effort to retire any portion of his debt, and in fact, has established, through his own testimony, that he deliberately chose not to make any payments to his creditors in the year and a half prior to the Petition Date in order to avoid *creating a preference*! [Findings of Fact Nos. 16, 22–25]. This is exactly the type of unseemly and selfish behavior that, if tolerated, casts a pall on the bankruptcy system—and therefore, constitutes "cause" under § 707(a).

Indeed, the very notion that a debtor should be able to justify his not paying a creditor because he fears that the creditor would subsequently be sued for a preference is ludicrous. If anyone could justify having such a concern, it would be *the creditor*—and this Court, after more than ten years on the bench and over twenty years before that practicing law, has never seen or heard of a creditor refusing a payment out of fear of a subsequent preference lawsuit. Every creditor the undersigned judge has ever observed has always operated on the maxim of "take the money now and only worry later if a suit is filed." Indeed, most sophisticated creditors know that *every* payment that they receive is potentially subject to a preference lawsuit.

There is more. In *Schwartz,* the bankruptcy court determined that "cause" existed where the debtors were leading an extravagant lifestyle, "which continued post-petition without any hint of belt tightening," 532 B.R. at 715, and where the debtors "fail[ed] to use any of their earnings or assets to pay any part of the debt they owed [to their creditors]," 2015 U.S. App. LEXIS 14846 at *7. Here, shortly before the Petition Date, the Debtor decided to lead the lifestyle of the rich and famous by taking expensive trips to Hawaii and Scottsdale. [Finding of

22

Fact No. 31]. The Debtor also spent over $6,900 at retail stores such as Nordstrom and Zappos, among others, [Finding of Fact No. 30], and an additional $2,514 at the Apple Store, [*id.*]. Furthermore, the Debtor spent lavishly on personal grooming services, shelling out more than $2,000 at a day spa, $500 at a nail salon, and $3,800 at a fitness club. [*Id.*].

Moreover, within the twenty-two month period of the Petition Date—and notably, after the Debtor had retained a bankruptcy attorney and was receiving counseling—the Debtor spent substantial amounts of cash on numerous consumer goods and services. [Findings of Fact Nos. 16, 20, 25, 30 & 31]. For example, he spent $8,733 on a bedroom furniture set; and over $19,600 at Nordstrom. [Finding of Fact No. 20]. He was also clearly making purchases at other stores, as his American Express bill totaled over $47,000 for one month. [*Id.*]. Moreover, the Debtor splurged on a $22,591 two-year prepaid lease for his wife on a Mercedes-Benz vehicle and spent more than $35,000 so that he and his family could jet set around the world. [Finding of Fact No. 25]. During this time period, the Debtor's stepson participated in a $16,813 program through "Projects Abroad" where he traveled to Peru and Nepal, while the Debtor and his wife globe trotted—in addition to the above mentioned trips to Scottsdale, Arizona and Hawaii—to London, San Francisco, Phoenix and Michigan. [*Id.*]. Given these extraordinarily high expenditures for what were clearly luxury goods, it is no coincidence that the Debtor and his wife established a separate account in her name into which the Debtor's salary was deposited by his employer. [Finding of Fact No. 17]. The Debtor, by his own admission, did not want his creditors garnishing any account in his name; and he and his wife clearly used the funds that were deposited into her account to make their purchases, take their trips, and lead a glorious and gluttonous life. [Findings of Fact Nos. 17, 20, 25, 30 & 31].

There is even more. On his Schedules, the Debtor represents that due to his expenses, he

23

will only have $2.68 monthly net income despite generating monthly gross income of $23,193.33!!! [Findings of Fact Nos. 12 & 13]. Of his monthly expenses, the Debtor includes $560 on home maintenance, most of which is attributable to the cost of a housekeeper and $324 on storage for his *excess furniture*. [Finding of Fact No. 12] (emphasis added). The Debtor has further scheduled a total of $1,000 a month for "personal care products and services" and the cost of the "barber and beauty salon." [*Id.*]. He has also scheduled $500 a month for transportation and toll road fees despite the fact that his Suburban, its maintenance, and gas is paid for by his employer. [Findings of Fact Nos. 9 & 12]. Additionally, the Debtor's expenses include a $500 allowance for his unemployed, 20 year old stepson, who lives with the Debtor, in addition to the $500 scheduled for his stepson's education costs. [Findings of Fact Nos. 11 & 12]. Viewed as a whole, the Debtor's scheduled expenses demonstrate no "hint of belt-tightening" and are certainly extravagant, if not downright outrageous.

In the wake of his own company's bankruptcy, the Debtor is left with a significant amount of unsecured debt (i.e., approximately $16.9 million) due to his execution of personal guaranties. [Finding of Fact No. 15]. However, in response to his debts, this Debtor, yet again, has demonstrated no "hint of belt tightening." Rather, based upon a calculated "I come first" bankruptcy planning, the Debtor spent as much of his cash as he could on luxury goods and services in the months, and even years, leading up to the Petition Date in order to avoid repayment of any portion of his debts to any of his creditors, [Findings of Fact Nos. 16, 20, 25, 30 & 31]; and now he expects to receive a discharge of both his business debt and his credit card debt. Finally, the Debtor, no doubt based on advice from his bankruptcy attorney, protected a significant amount of his income from the reach of his creditors by sheltering it in his 401(k) retirement funds through contributing the maximum amount of voluntary annual deductions, in

addition to catch-up contributions; all of which began the month he chose to stop paying his major personal creditor, American Express. [Findings of Fact Nos. 16, 21 & 26].

In sum, the Debtor has exhibited an incredibly cavalier attitude towards the bankruptcy system in general and his own creditors in particular. With this attitude, he "shouldn't be in a Chapter 7." *Schwartz*, 532 B.R. at 715. Returning to the Fifth Circuit's admonition in *Atlas Supply* and *Cypress Financial* that this Court should balance the benefits of dismissal versus the prejudice of dismissal, this Court concludes that the benefits of dismissal greatly outweigh the prejudice of dismissing the Debtor's case. *Atlas Supply*, 857 F.2d at 1063; *Cypress Financial*, 2015 U.S. App. LEXIS 14347 at *2. By dismissing this case, the integrity of the bankruptcy system will be vindicated because the Debtor's calculated and outrageous spending on luxury goods and services will not be rewarded with a discharge. Meanwhile, the Debtor will hardly be prejudiced by a dismissal. He will have the opportunity to file a Chapter 11 petition, and then obtain confirmation of a plan which will afford him the opportunity to obtain a discharge after paying a relatively small portion of his debts. Indeed, the UST emphasized that her analysis of the Debtor's present income and total debts would lead to a payment of approximately three percent of the Debtor's total debt under a 60-month plan of reorganization. [Finding of Fact No. 14]. Thus, in a Chapter 11 case, the Debtor would actually receive a discharge of ninety-seven percent of his total debt after he completes all of his plan payments. 11 U.S.C. § 1141(d)(5). Such a result accomplishes the primary two objectives of the bankruptcy system: namely, receipt of a discharge *and* payment of allowed claims to the extent possible. *See In re T-H New Orleans Ltd. P'ship*, 188 B.R. 799, 807 (E.D. La. 1995), *aff'd* 116 F.3d 790 (5th Cir. 1997).

## V. CONCLUSION

In *In re Swift*, the Fifth Circuit, in affirming a denial of a discharge under § 727(a)(2),

stated the following:

> As the [bankruptcy] court pointed out, nearly every asset in [the debtor's] estate had been
> tampered with before bankruptcy.  Unfortunately, the line between legitimate pre-
> bankruptcy planning and intent to defraud creditors contrary to § 727(a)(2) is not clear.
> One court simply stated, "[t]here is a principle of too much; phrased colloquially, when a
> pig becomes a hog it is slaughtered." As the finder of fact, the bankruptcy court has the
> primary duty to distinguish hogs from pigs.

3 F.3d 929, 931 (5th Cir. 1993) (citations omitted).

In the case at bar, this Court finds vitality in the pig/hog directive.  The Fifth Circuit used

the word "hog" to characterize the principle of "too much."  *Id.*  Even though the Debtor in the

case at bar has not committed fraud, he is simply asking for "too much."  The same was true for

the investment bankers who appeared in this Court in the *Energy Partners* case and requested

up-front guaranteed fees in a ridiculous amount.  *In re Energy Partners, Ltd.*, 409 B.R. 211

(Bankr. S.D. Tex. 2009).  This Court denied their application for employment by stating the

following: "Although the Fifth Circuit expressed this sentiment under a different set of facts than

those in the case at bar, this Court sees good reason why this maxim applies here with equal

force. These two investment banking firms have become hogs." *Id.* at 237.

The investment bankers in that case, just like the Debtor in the case at bar, had committed

no fraud.  *Id.* at 237.  They simply wanted too much—just like the Debtor here wants too much.

He wants a complete discharge now despite his excessive spending—on himself, his wife, and

adult stepson—and despite his ersatz excuse about not paying his creditors because they might

be subsequently sued for preferential payments.  His lavish lifestyle and complete unwillingness

to sacrifice anything at all for his creditors are simply "too much."  To deny the Motion and now

allow him to obtain a discharge would—to use the Fifth Circuit's lexicon—"prejudice the

26

bankruptcy system." *Cypress Financial*, 2015 U.S. App. LEXIS 14347 at *2.  The purpose of obtaining a discharge in a Chapter 7 is to obtain a "fresh start," not a "head start."  *Havis v. AIG SunAmerica Life Assur. Co. (In re Bossart)*, 2007 Bankr. LEXIS 4349, *64 (Bankr. S.D. Tex. 2007); *In re Kleibrink*, 346 B.R. 734, 753 (Bankr. N.D. Tex. 2006) (quoting *In re Godios*, 333 B.R. 644, 647 (Bankr. W.D.N.Y. 2005)).  Here, to allow the Debtor to obtain a discharge would be giving him a "head start."  This, the Court will not do.

Finally, this Court acknowledges that if the Debtor resided in some other circuit—particularly the Ninth Circuit—he might well prevail in the dispute at bar.  The rather robotic checklist approach taken by the Ninth Circuit and other courts would probably reward the Debtor for his timely, complete, and accurate filing of his Schedules and SOFA by denying the Motion.  Unfortunately for the Debtor, he lives in the Fifth Circuit; and this Court, taking guidance from the Fifth Circuit's holdings in *Atlas Supply*, *Cypress Financial*, and *Swift*, concludes that it should reject the narrow interpretation of "cause" articulated and applied by the Ninth Circuit.  Granted, the Fifth Circuit has so far declined to expressly choose sides in the split among the circuit courts about the meaning of "cause" under § 707(a).  Perhaps the Debtor's counsel—who are indeed capable attorneys—will appeal this Court's ruling and thereby convince the Fifth Circuit to expressly make a choice and adopt the Ninth Circuit's approach.

In the meantime, this Court finds that this case should be dismissed without prejudice to the Debtor refiling a Chapter 11 petition.  An order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Date: October 15, 2015

Jeff Bohm
United States Bankruptcy Judge